This panel is sitting this month. We have four cases on the docket this morning. I don't know if lawyers for all four are in the courtroom yet. We will take a break at some stage, is my anticipation, and then pick up the rest of the docket a few minutes later. The first case of the morning is Martinez v. Hinojosa, 2440535. Looks like we hear from Mr. Flores first. May it please the Court, my name is David Flores, and I represent the appellant Jorge Martinez in this case. This case asks whether one whose behavior was consistent with surrender, who was holding one hand held high above his head, the other holding a gun by the stock with the barrel pointed down, who did not make any furtive movements or point the weapon towards the officer or anybody else, can be shot by police without warning. In this case, Officer David Hinojosa shot the plaintiff, Jorge Martinez, after he exited his home, one arm raised, the other with the barrel pointed down. Approximately 15 seconds elapsed from the moment that Officer Hinojosa first saw Mr. Martinez exit the home to the moment that he was shot. At the time that Officer Hinojosa shot Martinez, he was approximately 60 yards away, taking cover behind a tree. Now, when we apply the gram factors, we do look at from the officer's standpoint. So he, you agree that sort of, there'd been a police, was the police officer shot and killed or just shot? He was shot in the leg. Shot in the leg, and then there was flight. So we've got evasion plus violence. The facts are, there was an initial barrage of gunfire. Officer Hinojosa was late arriving to the scene. When he arrived, there were still some shots being fired. There was about five minutes that passed by where it was pretty quiet, and that is when the plaintiff, who had disarmed the assailant, exited the home. And so by that time, again, there was about five minutes that it was quiet, and he was 60 yards away approximately, taking cover behind a tree when Martinez exits with one arm raised and the other holding the gun down. Looking at the video, a reasonable jury could find that his conduct was consistent with surrender. Because of that, and because there were no furtive movements, meaning he did not try to raise the weapon towards the officer or anybody else, Alvin? No, no, go ahead. I'm just listening. I mean, if I remember Martinez's own testimony, he acknowledges he comes out of the door really fast, but that's because, if I remember, he wanted to get the gun away from the home invader that he had disarmed. So he's worried about the safety, but that would suggest in the middle of the night after a shootout, a guy comes running out naked with a gun. Well, the video evidence shows that he is not coming out really fast. Now, he is moving quickly, but he is not running. The video that we have that is part of the record. But I guess what I'm saying is when you say consistent with surrender, his own testimony was he was just trying to get that gun away from the home invader, correct? Yes, but what you see in the video is when he approaches and he reaches, the first time the video captures him is when he reaches the top of the driveway. He pauses there for a number of seconds, at least four, maybe five. He's got his hand up and he's looking around as if looking for help and a gesture of surrender. That is what the video evidence and that's what a reasonable jury can find. They could look at this video and say this is not somebody who had any. Now, granted, there's always a threat presence because there is a weapon, but a reasonable jury could look at this video evidence and say this is somebody who is surrendering to the police. He's got the weapon down and he's got his arm up. But what's your case that shows every reasonable officer would have known that? There are two lines of cases. Now, the ones that are on point is Cole v. Carson and Baker. Cole was coming out of the forest backwards with a gun in his head. Cole had a gun to his head coming out backwards. The police were approaching from behind him. I know, but he walks out of the forest backwards with a gun in his head. That is a very controlled situation. Very different than a man rushing out who Hinojosa thinks is still the man who just shot police minutes earlier. Why would he trust that person to surrender rather than deceive and shoot again? It's not about trusting him. What it's about is because he made no furtive movements. He is not trying to raise the gun. He's got one arm raised. He at least was entitled to a warning before shooting him. And we must look at his reasons for not giving that warning. What he says is the reason I didn't give a warning is because I did not believe that he would hear me. He did not say I didn't have sufficient time because he was raising the gun at me in a way that I had to act quickly. He didn't say that. He said I didn't believe he would hear me. Because there's no QI law that we've got that says the police have to wait until they start to raise the gun. So your argument really is this fits into our duty to warn case. It is 100% a duty to warn. And so tell me what you think the state of our law is as to when the Fourth Amendment does require the police to first warn an assailant who has a firearm and is approaching them because your client was turning towards Hinojosa. Yes, yeah. Well, the video shows that when he reaches the street, he's turning back towards the home. He's not aware of Hinojosa and Hinojosa is taking cover 60 yards away. But maybe just answer my question. When do police have to give a warning before lethal force even as to someone who's got a gun? If there is a movement, a furtive gesture as if they're going to take some action, no warning is required under the current status or the status of the law. You are saying the law says police have to wait before they can shoot until the gun gets pointed at them. And that's not Colby Carson. Well, that's Baker v. Putnell. In Baker v. Putnell, there was a chaos on the beach. There was shooting on the beach. Officers arrived, and a witness points the officer to a vehicle that the assailant was in. In that case, the officer saw that he had a gun in his vehicle, or he appeared to be reaching for a gun, and he was. In that case, the person or the suspect in the vehicle turned towards the officer. In that case, the court said a mere turn was not sufficient. And because there was not, there was that lack of immediacy, a warning had to be given. Here, all the factors point to a lack of immediacy. There was no one else, there's no evidence that anyone other than Officer Inhofe was in the zone of threat or in any type of immediate threat that would require that he be shot without warning. But how would he know, how would the officer know that a warning had not already been given by another officer? Because, as I mentioned earlier, there was about five minutes before Martinez exits the home, there's about five minutes where there's no activity. If we look at the body cam of the officer, he has taken cover, and a number of minutes go by, and it's quiet, there's nothing. And that is when Martinez exits the home. Now, at that point, Officer Martinez thought it feasible to warn everybody else he is naked and he's got a .32. I understand that .32 is code for gun. And so he thought it feasible to warn everybody else, hey, he has come out of the home, he's got a weapon, and he's naked. Nobody else, I think it's telling, warns him or shoots. Because I believe, and if you look at this video, his conduct or a reasonable jury could find that it's consistent with surrender. And that is like the puddle, and it's also like Carson, because when someone is surrendering here, and I think this is one of those cases where the broader rule put Officer Nohosa on notice that his conduct was unconstitutional. Because we know officers at that time knew that you cannot shoot somebody who's surrendering. Officer knew at that time that unless there is, because he's also 60 yards away, without some type of furtive gesture, a warning is required. And I think that's what he was on notice of on the Baker v. Putnell case. And I think even the Colby-Carson is somewhat illustrative that even if you have a weapon, unless there's some immediate threat that justifies the lack of warning, you must give that warning. It's part of your argument, factually, that it was unreasonable, no case law would support, that at this distance, roughly 60 yards, though it's not confirmed, but a fair estimate, I would assume, that at that distance there just wasn't any risk to the officer? I'm not saying there was no risk, but the risk was that, though it may be . . . What is the significance of the distance in your argument, in your analysis? It factors against the immediacy of the threat such that a warning is required. Now, there is the, and I think it's illustrative here, is the Powell v. Snook case, very similar to ours. There the court found his conduct was reasonable. Like here, there was an innocent party, had a gun. In that case, the officer was within feet of the suspect. In that case, the suspect turns to the officer and raises the gun to hip height. There, they said, because he raised the gun to hip height, because of the proximity between the officer and the suspect, no warning was required. Correct, and you say innocent. Obviously, had they been responding to just a quiet neighborhood, a guy comes out even with a gun, and according to some neighbors, he's yelling, I'm not a threat, or you're saying he's surrendering. But the unique thing about this case is they're responding to a shoot, a very violent situation where a police officer had been shot. And you don't disagree with me. Hinojosa is thinking it's a case of mistaken identity. Yes. Yes, he's thinking it's, how do you pronounce the name of the assailant?   He thinks it's Terasas. But even assuming if it was Terasas, if he was surrendering the way this video shows, and because he's not within that immediate zone, he's got that distance, and it factors against the immediacy of the threat, because there's no furtive movement, no gesture, a warning must be given. I guess I have difficulty saying it's a surrender if you're moving quickly, whether it's frantic or frenzied or not, and you do not put the gun down, and you don't say, I surrender, you know, right? We've got the body cam, and the body cam is not, it is actually Hinojosa's body cam. That's correct. And you can't hear him saying, I'm not the shooter, I'm not the shooter, even if the witness is telling you. Well, what you can hear is some yelling. Some yelling. And that's through his body cam. Right. And so you can imagine that. How does that equal surrender? Yelling, guy with gun who just shot at police, doesn't put the gun down, moving quickly. Where is the surrender in that? Taking the totality of the circumstances as we must, with his arm raised above his head, the gun barrel pointed down, that I think a jury can look at and say, this person has no, whether or not he was at one point the murderous assailant, or an innocent victim, when he's coming out of this home with the arm raised above his head, with the gun with the barrel pointed down, shouting, I'm not the shooter, in that circumstance, because there is no furtive gesture, he's not trying to raise the weapon, under those circumstances and under the status of the law at that time, a warning was required. Do you want to quickly touch on what your theory of Monell liability is? Now, this becomes difficult because the district court did not allow us to proceed with discovery under the Monell claims until after we resolved the qualified immunity claims. Now, we have alleged a failure to train, and the standard allegations are made in cases like this, but I would ask this court, because I do believe there is a tribal constitutional issue, that if the court would remand this case for trial and allow us to do discovery on the Monell claims, we'd be in a better position to be able to respond at this point and respond to a motion for summary judgment. I think it's a little bit premature at the time when the motion for summary judgment was filed, to seek it on that front when the district court had issued an order not allowing discovery on that claim. Counsel, is it your position, if this court finds, just setting this out as a premise, that qualified immunity was appropriate because, in part, two steps, but in part because there was no constitutional violation, were the court to hold that? Could there be Monell liability? If there's no constitutional violation, there is no Monell liability.  I just want to make sure you weren't making a contrary argument. You don't need to go further. That's correct. All right. Thank you. Good morning, Your Honors, and may it please the Court. My name is Lindsey Hale, and I am here with my co-counsel, Mick McKamey, on behalf of the appellees in this case, Officer Hinojosa and the City of Laredo. Now, the questions presented before this Court today are, first, whether the district court correctly granted Officer Hinojosa's motion for summary judgment because his actions were, in fact, objectively reasonable in the midst of an active shooter situation, and thus his actions are protected by qualified immunity, and, secondly, whether the district court correctly ruled that the appellant failed to plead sufficient facts to state a municipal liability claim when there was no constitutional violation. Now, whether or not qualified immunity applies in this case so far hinges on the objective reasonableness of Officer Hinojosa's actions. So we believe that the district court correctly held that Hinojosa's conduct was objectively reasonable, and I want to point out that this Court has stated previously in Brown v. Callahan that whether or not an official's conduct is objectively reasonable is a matter of law for the Court to decide and not a question of fact for the jury. So the Court is trying to determine this. Now, we're looking at the use of force by police officers. Objective reasonableness, as we've talked about, depends on the facts and circumstances, the totality of the circumstances of that particular case as they were perceived by the officer on the scene. What do you do with the time lapse? The time lapse comes out of the house, and there's about 13 seconds, right, from beginning to being shot. Sure. That's a pretty significant period of time for the officer to have assessed the situation and determined whether he was surrendering, as counsel opposite says, or was a threat. Absolutely. So still, if you look at the totality of the circumstances, even what's going through his mind before that time period, I want to remind the Court this is an active shooter situation, and even though Mr. Martinez claims that there were five minutes before shots were fired, Officer Hinojosa was immediately met with gunfire when he arrived on the scene. Yes, but that five minutes is relevant. I mean, in other words, when a situation calms or perhaps has ended, you can't use lethal force after a certain interval of time. Absolutely. But if you watch his body camera footage, the most previous shot was fired one minute and 45 seconds before Mr. Martinez exits the home. There are still shots actively being fired within that five-minute period. And so I think that's inaccurate based on what we hear on the body camera footage, and it also shows the immediacy. Again, it's an active shooter situation. It took place in the middle of the night or the early morning hours. When Officer Hinojosa arrives, he – It wasn't light yet. It was like 5.30 or 5.00.  I believe the timeline was 5.55 in the morning. So it's still dark. And as Mr. Martinez has alleged, you can't even see him in person until he gets under the light by the garage. So it's dark and hard to see. You'd agree that it'd at least be a fact issue if Hinojosa had heard him say, I'm the victim, I disarmed him, please don't shoot. Potentially, I think yes. I think it could make a difference, and that could be a fact question, yes. But didn't Ms. Hill, with her cell phone, record him saying, please don't shoot, don't shoot me? Yes, there is evidence that there was witness testimony that witnesses were able to hear Mr. Martinez. However, there is no evidence that shows that Officer Hinojosa was able to hear him make those statements. And Mr. Martinez even admitted in his pleadings in an argument today, Mr. Flores, stated that at best on the body camera footage, all you can hear is inaudible yelling. And if anything, that adds to the immediacy and the confusion. So you disagree with their fact statement that Ms. Hill and Mr. Flores, the two witnesses that did say, they heard it clearly, they heard him screaming with one hand up, don't shoot. Do you agree with their statement that they were located further away than Officer Hinojosa? I agree with their statement that they were located in a completely different position of Officer Hinojosa. And that changes the perspective of Officer Hinojosa, and we have to look at his perspective, not the perspective of other witnesses that were present. Are you saying it's not a fact question? It's enough for the officer to say, I did not hear. And unless a plaintiff can come up with evidence in some more direct way than what we're talking about, there's no possible fact question of whether the officer did hear? I'm saying that that's not a fact question here, because what we have in this case is we also have video evidence that confirms that testimony that contradicts the evidence that's been presented. You're talking about the body cam recording?  Is there any evidence that that is necessarily going to reflect what he actually heard? I mean, recordings can be less precise, less clear than what somebody's actually hearing. Sure, but I think when you couple that with the testimony that he could not hear him, I think that that corroborates his version of events. It would have to blatantly contradict it, wouldn't it, under Scott v. Harris? Blatantly contradict. In other words, you've got a unanimity of testimony from other bystanders that their neighbor's just heroically running out with the gun that he took away from the assailant, screaming, don't shoot me, I'm not the one. Yes, Your Honor. But to discount that, because no police officer could, without a warning, just shoot dead that person, I don't think, that wouldn't be reasonable. So then we have to, are you saying that the body cam is what blatantly contradicts the testimony of the two neighbors? Well, I think it does, because I think, again, the testimony of the two neighbors in this case isn't necessarily relevant to Officer Hinojosa's perspective of the events as they took place. They weren't standing next to Officer Hinojosa. They weren't even on the same side of the home as Officer Hinojosa. And we have to look at the perspective of events as he perceived them. And under his version of events, under his recollection, he has testified, and we have video evidence to confirm or corroborate that he could not hear these statements. Let's take out the video, audio evidence. Did I interrupt? I'm sorry. Let's take out the audio evidence from the body cam. And all we have is his denial and this other, all the evidence is otherwise the same. But we take out the audio from the body cam. Where are we? Is it a fact question? No, Your Honor. I think this is still a question of law for the court to determine. Well, no, whether he heard or not. It does seem to me, consistent with what Judge Higginson was saying, that it does seem that if he actually heard this, the Officer Hinojosa actually heard what Mr. Martinez was yelling, then shooting him is a very different situation. And so if you take out the audio and so you have a sort of evidence from people potentially closer to, I mean, further from the person who was yelling this, saying, yes, I heard and heard it clearly, and then you have the Officer closer saying I didn't hear, isn't that just a fact question for the jury? Again, it's a hypothetical, so don't worry about the actual facts. What's your reaction to that? Well, I think in this case, I mean, there has been no testimony that shows that Officer Hinojosa did, in fact, hear him. They just say, well, we think he should. So he can always deny, so long as the Officer denies hearing, that's game over. No, but I think in this case, again, I don't think that his reasonableness, the objective reasonableness only hinges on whether or not he was able to hear Mr. Martinez. Again, as Judge Higginson stated, that even if he were able to hear him, that doesn't preclude the fact that he was, again, we think that he's the shooter, that he's lying in order to evade police. Again, he's already shot a police officer. This is a very violent situation. It's an active shooter situation. There's nothing that suggests that even if he were able to hear him, that by default that Officer Hinojosa is required to believe that this is a factual statement. And when you look at everything else that's happening and you put it all together, that alone doesn't require him to not make his actions unreasonable. That was going to be my question, less hypothetically. Assume there is an issue about whether he heard or didn't hear, or assume he heard what the plaintiff said, would that defeat summary judgment? I mean, I think you've answered it, but that was going to be my next question, was do you still get summary judgment on either prong one or prong two of qualified immunity? I think you still do. I think you still do because, again, I don't think that just because he heard, even if he were able to hear him, that does not take away the objective reasonableness of his actions because he still would have reason. This is still a threatening situation. Again, the totality of the circumstances still warrant that action. What's your best case to support that position? That it doesn't matter whether he heard him or not? Yes, or just what you're saying as far as the totality of circumstances, even assuming he heard what the plaintiff said. I think this was a statement that the district court, there was a finding that the district court made that they stated in their ruling that besides the fact that even if they weren't able to hear him, that that would still be, that still does not take away the objective reasonableness of his actions. But what's your best case to support that proposition? I don't think that there's a case on point that determines that, that we know of that considered this exact situation. Do you want to speak to the case he stressed, the Baker v. Putnam? Yes, I would, Your Honor. Thank you for bringing that up. I would like to really distinguish these cases here. I think they're very different. In Baker v. Putnam, the court didn't hold that qualified immunity didn't apply in that case solely because a warning was feasible and was not given. There was a factual question in that case as to whether or not the decedent was, A, either holding a weapon, or B, was facing the officer when he was shot. I mean, the medical examiner's report indicated that he wasn't facing the officers. And additionally, there was no video evidence to support or deny or to confirm either action or versions of events as they were presented. That's very different from this case. It is undisputed in this case that when Mr. Martinez exited the home, he was carrying a weapon. And I want to point out the fact that even though he alleges, Mr. Martinez alleges that he removed the magazine, he also testified that he did not take the bullet out of the chamber, and Officer Hinojosa had no reason to believe that this weapon was not loaded. So he sees someone carrying a weapon in an active shooter situation that he has no reason to believe is not loaded. What would you think a resident should do? They call 911 because a violent home intruder has come in. I take it he then fought and somehow disarmed this guy. What should he have done? I think he had options. He doesn't want to stay in the house with the guy. Sure. I don't think that carrying a weapon in a situation like this is an action of surrender. Or as soon as you walk out of the home, you put it down. When he paused at the top of the driveway, he could have put it down. Again, he is away from the—if he's trying to get the gun away from the shooter, as he alleges, he had multiple opportunities to do that. There's no reason you would dispute that, right? It's clear that is what he was doing. I think that's what he alleges his intent was when he was leaving the home. Your theory isn't that he was going to shoot the police. This is a terrible case of mistaken identity. I think Officer Hinojosa's perception was that he potentially could have shot the police. Martinez, the home. Yes, as he exited the home, because he believed that Mr. Martinez was the shooter. And, again, I think that that's what we have to look at. The only way someone who's got their own Second Amendment gun in there— so let's assume he doesn't miraculously disarm the home invader. Let's just say he's trying to find the guy and he's got his gun. The only way a resident can avoid being shot without a warning is if they immediately put the gun down? I don't think that's the only way, but I think it is an option. What else should he have done? Wasn't his daughter or his mother shot, too? Yes. However, I would like to point out that Officer Hinojosa was not aware of that. I know, I know, but I'm just saying—I'm just trying to imagine what you're saying a resident should do that heroically saved his mother and daughter, one of them shot. He gets the gun. He knows there are police outside. What does he do other than say, don't shoot me, here it is? And this was a tragic case, I agree with you, of mistaken identity, and I can't take that away from here. But again, the actions of Mr. Martinez led Officer Hinojosa to believe that it was still a threat. When you watch the video and you read the district court's description of that video, the dash camera video, where you can clearly see Mr. Hinojosa—Mr. Martinez, pardon me. He is constantly swaying. He's constantly moving. And it's undisputed that he turned towards Officer Hinojosa's position before he was shot and that Officer Hinojosa's perception was when he turned towards him, the gun could have been lifted immediately at any moment to continue a shooting spree in this active shooter situation. So I think that in that case, I mean, there are so many circumstances that justify the objective reasonableness of this action. But you had 13 seconds where the officer could have said, put the gun down or put both hands on your head. Something, some kind of warning, some kind of instruction or order, and the officer didn't do that. So I think a warning in this case wasn't necessarily feasible for several reasons. But one is if you look at—I mean, again, it's dark from what we can see. And even if we can see him leaving the scene, if you take into consideration the time that Officer Hinojosa yells out his description to other officers that are around, that he is naked and that he's carrying a firearm, and the time that he fires his own gun, it's two seconds. And I think that's a very short time period. If you were going to give a warning in that, it would have to be simultaneous with his shot. And additionally, he testified that as—again, the threat was when Mr. Martinez turned towards him, the gun could have been raised immediately. That's an instantaneous decision that Officer Hinojosa had to make in this situation in order to protect himself, his fellow officers, and the public at large. And so I don't think a warning is feasible in that situation because, again, that is an instant, immediate decision when the threat was immediate. So I ask opposing counsel this. What's your reaction? How relevant is the distance between the two at the time of the shooting? It does seem to me it's at least relevant insofar as any reasonable apprehension of danger that they're that far apart. I watched some football yesterday. Sixty yards is a pretty long way to go. It is a long way when you're trying to run ball down a football field, but I think that's a little different when you're dealing with firearms because, I mean, that's a— and in this situation because that is a situation that can change immediately, it's not going to take, you know, 60 seconds potentially to get 60 yards. And I think that that distance in this case is relevant for multiple reasons. First of all, when we talk about the feasibility of a warning, right, part of the reason that Mr. Officer Hinojosa didn't believe a warning was feasible was because he couldn't hear him. He strikes me kind of both ways. He's too far away to hear a warning, but he's close enough that he could hit me with an instantaneous moving up of this firearm and setting himself and firing. Doesn't it sort of cut both ways that it was too far to be heard but too close for me to be safe? No, Your Honor, I don't. Because, again, he's—I think that Officer Hinojosa is not only acting to protect himself but other fellow officers that are closer or public—members of the public and residents that are closer to that. But another reason that I believe that the distance is important here is Mr. Martinez alleges, again, that he removed that part of his act of surrender, which I don't understand how carrying a weapon is an act of surrender, but that he removed the magazine from the firearm and that Officer Hinojosa should have been able to see that. But there's been no evidence presented that in the dart from 60 yards away that Officer Hinojosa was able to see that in any manner. And I think that's important. Again, when you put the fact—put into consideration the totality of circumstances, Officer Hinojosa believed that in this active shooter situation this person is leaving the residence with a loaded firearm that could turn towards him—he's moving quickly, he's moving frantically— and could have turned at any moment to raise his weapon, pardon me, and continue this alleged shooting spree. Unless my colleagues have any more questions on that, do you want to address Menil liability briefly? Yes, Your Honor, I do. Thank you. I think that we're at a very early stage in that, but essentially, I mean, we know, again, as Mr. Flores stated, that if there is no constitutional violation, there can be no municipal liability. And in this case, the district court held that Officer Hinojosa's actions were objectively reasonable, so there was no constitutional violation and there cannot be constitutional or there can be no municipal liability. Now, if we look at any evidence even that has been presented at this point, Mr. Flores claims that there should be municipal liability because there is a pattern of events, potentially, that show a custom or policy of the city that would lead to this deprivation of rights. And he leans on three separate isolated incidents over a four-year period of alleged acts of deadly force. Now, this case or this court considered in Peterson a similar situation where you looked at 27 separate incidences over a similar four-year time period of deadly force and ruled that that was not, in fact, enough to show a pattern for a custom or policy of a city to support these constitutional deprivations. So I think in this case, it's clear that because there's no constitutional violation, there can be no municipal liability. All right, Counsel. And so for the aforementioned reasons, we ask that this court affirm the ruling of the district court, rule in our favor, and dismiss Mr. Martinez's claims of prejudice. Thank you, Your Honors. No more. Thank you. Briefly in rebuttal, Your Honors. Opposing counsel mentioned that the objective reasonableness or unreasonableness of an action is a matter of law for the court to decide. But this court, in two separate cases, has said, and one is the Basan v. Hidalgo County and the other is the Williams v. Brammer, that if there is questions of fact that are in dispute that go to the objective reasonableness, summary judgment is not appropriate. Here, I would argue that there are several questions of fact that go to the objective reasonableness of Officer Nojos' conduct. One of them, I believe, is the video evidence. I believe a jury viewing this evidence could find that his conduct is consistent with surrender. And that is important because coupling that with the lack of a furtive movement or a furtive gesture, or raising the weapon in such a way that a reasonable officer could believe there was an intent to use it, without that— How long after he warns his colleagues he's got a gun does he shoot Martinez? It's a few seconds. Three to five, perhaps. That sort of corroborates that he thought he was facing a threat. He didn't see a surrendering man, right? He didn't say, you know, hold fire, he's surrendering. He said he's got a gun, two seconds pass, he shoots him. Isn't that further corroborating? I think that counters against that is that he didn't issue that warning. Clearly, there's always a threat because of the fact that there's a gun. We recognize that. You don't warn a surrendering man, they're just surrendering. And that's my point because he did not say throw down your weapon. That doesn't suggest to me that it's unreasonable for him to have not perceived this moment as a moment of surrender. I believe a reasonable officer, viewing the facts that we know he saw from his perspective, would have concluded that he was surrendering. And we know he was— Do you have a case indicia of surrender? Do you have one? Because obviously Putnam isn't a surrender situation. Neither Putnam, but— What's the best case that sort of confirms that what an officer's looking at is a surrendering situation? Well, I think the general rule, because I think any officer knows that you cannot shoot somebody who's surrendering. So I think the general rule that says you must give a warning when it's feasible to do so, if a reasonable officer concludes that his conduct is consistent with surrendering, the general rule puts them on notice that that conduct is unconstitutional. A little bit different than the brief, I think, and you may tell me it's not, is when I read the brief, I really thought the fact issue was that other neighbors thought that it was clear he wasn't the assailant. But your argument, mostly orally, is saying, oh, no, this guy was perceived to be the assailant. Put aside that he's screaming, I'm not the shooter. Your theory is that he and Jose saw the shooter, but the shooter was surrendering. Those are different fact arguments. I believe there's a question of fact as to whether or not the officer heard him shout, I'm not the shooter. You can hear some inaudible yelling from the body cam, and you can hear testimony from others who are further away, one person inside her home that heard him. My argument is not that he thought it was the shooter. My question is that even if it were the shooter that was saying those things, when your conduct is consistent with surrender, even if it was, you cannot shoot him unless you warn him. And I think there's a little nuance and there's a difference there. But I think there's questions of fact here that should be resolved by a jury that go to the reasonableness of the officer's conduct. We respectfully request that this court remand this case to the district court for trial. Thank you very much. Thank you. Thank you both for helping us understand this case better. We'll take it under advisement. We'll call the next case.